## Case No. 4,791.

### FINDLAY'S EX'RS v. BANK OF THE UNITED STATES et al.

[2 McLean, 44.][1]

Circuit Court, D. Ohio. Dec. Term, 1839.

N. Wright and Mr. Worthington, for plaintiffs.

Mr. Chase and Mr. Fox, for defendants.

OPINION OF THE COURT. This bill was filed by the complainants to procure certain credits on certain judgments obtained by the Bank of the United States, against Findlay, in his lifetime, as the surety of Sutherland. Findlay, and one Thomas Irwin, who some years ago deceased, indorsed three several notes to the Bank of the United States, for Sutherland, on which judgments were entered the 13th July, 1824, for $5,619 71; the 7th June, 1825, for $5,330 13; the 23d July, 1828, for $5,508 75. To secure the payment of these notes a mortgage to the bank was executed by Sutherland, the 25th September, 1829; and at December term, 1828, a decree was entered for $20,623 32, and a sale of the mortgaged premises ordered. Another mortgage, bearing the same date, was executed by Sutherland to the bank, to secure the payment of four several notes—two of which were indorsed by Joseph Hough. On the two unindorsed notes

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

judgment was entered the 15th July, 1824, for $2,726 25, and the 23d July, 1827, on one of the other notes for $4,841 36. On the other note, for $4,346 00, due 25th August, 1827, no judgment was obtained. A scire facias was issued on this mortgage, and a judgment obtained for $16,011 00 at July term, 1828. The judgment for $5,619 71, against Findlay, Sutherland and Irwin; and that for $2,726 25, against Sutherland only, were levied 10th November, 1824, on certain real property. On the 5th November, 1821, John Busenbach obtained a judgment in the court of common pleas, for Butler county, against Sutherland, which was levied 27th October, 1826, on a part of the property covered by the prior levy. The above judgments against Findlay, were, also, levied on his property the 16th June, 1827. In the spring of 1829, Findlay and Sutherland frequently solicited the bank to take the property mortgaged and levied upon at certain prices stated; and afterwards, the 29th June, 1829, an agreement, in writing, was made between the bank and Sutherland, by which the latter agreed to convey to the bank the property levied upon, and, also, that covered by the mortgages, for the sum of $25,794. This sum was produced, probably, by adding to the prices originally talked of, $1,000 upon a lot in Cincinnati, and deducting from the same $1,260, the balance due on the Busenbach judgment.

In addition to the above sum, the bank agreed to pay Mrs. Sutherland $3,000 for her right of dower; and it was agreed that the proceeds of the land covered by the mortgage, to secure the payment of the two unindorsed notes of Sutherland, and the two notes indorsed by Hough should be first applied in payment of Hough's liability; and that the residue of such liability should be discharged out of the proceeds of the property conveyed, exclusive of that which was mortgaged to secure the payment of the notes indorsed by Findlay; and it was stipulated that the property should be offered by the marshal at public sale. Sutherland executed the conveyances in pursuance of the agreement; and the property was publicly sold by the marshal, and credited by him on the several executions and order of sale, under which it was sold. The proceeds of the mortgaged property were applied in discharge of the liabilities which the mortgages were intended to secure; and the proceeds of the levied property were apportioned between the judgment against Sutherland and Hough, and the two against Sutherland only. The bank purchased the property at the marshal's sale, for less than the contract price. For the property levied on, the bank agreed to give the sum of $5,939, and this property was struck off by the marshal at the sum of $5,206 53. On the 10th September, 1830, the bank conveyed the lot in Cincinnati (conveyed to it under the contract with Sutherland for $10,000) to D. Griffen for the consideration, as named in the deed, of $19,000. These are the principal facts out of which this controversy has arisen.

Before the merits of the case are considered, it may be proper to notice an objection which arises to the jurisdiction of the court, from the parties to the suit. The complainants are citizens of Ohio, and Timothy Kirby, alleged to be the agent of the bank, and Samuel Gray, administrator of Sutherland, and Thomas D. Carneal and Lewis Whiteman, administrators of Irwin, whose citizenship is not alleged, are made defendants. To give jurisdiction to the court, it is as necessary to allege the citizenship of the defendants as of the complainants. This is in the nature of an original bill, and calls for the exercise of chancery powers; and if the defendants named are citizens of Ohio, it is clear the court, cannot, as the parties now stand, take jurisdiction of the case. It is true, the whole object of the bill is to have certain credits entered on judgments of this court; but the right of the complainants depends on the construction of an instrument, dated long after the judgments, and of certain equitable liens as between the sureties of Sutherland. This objection may be obviated by discontinuing the bill as to Kirby, who is not a necessary party; by making the administrators of Irwin co-complainants, and by discontinuing the bill as to the administrators of Sutherland. If the estate of Sutherland cannot be affected by a decree in this case, as it most clearly cannot be, his administrators are not indispensable parties in the case. In addition to this, the proof in the case shows that Sutherland died insolvent. With this intimation, which may be a matter for future consideration, the questions made in the argument will be examined.

The complainants insist that they are entitled to a credit on the judgments against Sutherland and Findlay, for the fair value of the Cincinnati lot, or the sum for which it was sold by the bank, deducting therefrom a reasonable amount on account of dower. At the time Sutherland conveyed this lot to the bank, the title was, to some extent, embarrassed; and there is no proof that the sum at which it was estimated was less than its value. There is no allegation of fraud in the conveyance of the lot to the bank, for the price agreed; and if such an allegation were made, it would not be supported by the fact that some fifteen months afterwards, the lot was sold by the bank at an advance of eight thousand dollars. Within this time an outstanding claim was bought in by the bank, the right of dower was paid for, and the property may have risen in value.

A debtor has an undoubted right fairly to convey his property in satisfaction of a debt, without the assent of his surety. If such conveyance be made fraudulently, with the view of injuring the surety, it should be set

aside. But if the parties act in good faith, and the transaction is characterized by fairness and propriety, though without the knowledge of the surety, he has no ground to complain, much less to set aside the conveyance. But in this case there is satisfactory evidence that Findlay, admitting him to be the surety of Sutherland, was desirous that the lot should be conveyed to the bank for a sum less than that which was agreed to be paid for it. The conveyance of this lot, and the other property, was made by Sutherland under the agreement which fixed the price 'at which the whole property was taken by the bank; and if this agreement, in so material a part as this, shall be set aside, how can any part of it be enforced? And if the agreement does not stand, the sales by the marshal, being public and in pursuance of legal process, must stand. This would reduce the gross sum for the property much below the price allowed in the agreement. In no point of view, as it regards the price of the property conveyed, is there any ground on which to set aside this agreement. There is neither hardness, unfairness, fraud, nor want of assent of the surety, on which to give relief.

The counsel for the bank insist that the evidence in the case does not show that Findlay was the indorser on the notes, without any interest in them, for the benefit of Sutherland. The notes were indorsed by Findlay and Irwin, and were discounted for the benefit of Sutherland. He is treated as the principal by the bank, in the negotiations respecting the property, in giving the mortgages, and, finally, in the conveyance of the property to the bank. In the agreement between Sutherland and the bank, respecting the property to be conveyed, the judgments are referred to as "against Sutherland and others as his securities." It is true that the judgments are not in form entered against the indorsers as sureties, but this does not lessen the force, and, indeed, the conclusiveness of the facts admitted. The parties to the agreement evidently looked more to the facts, with which they were familiar, than the technical description of the judgments. But, independently of this admission, there is enough in the facts of the case to show that Findlay was surety. If Sutherland were not principal, why did he give the mortgages to secure the payment of all the notes? Why did he negotiate with the bank to take property in payment of them? and why did he, finally, convey all his property to the bank? No doubt is entertained of the suretyship of all the indorsers on the notes specified. The relationship of principal and surety being established between Sutherland and Findlay, if this relationship continue, under the circumstances of this case, it may be proper to inquire whether the complainants would be entitled to the priority of the judgment against Sutherland and Findlay first levied, of which they have been deprived to

some extent, under the agreement. The proceeds of the property, bound by this lien, were applied to pay the judgment and note for which Hough was liable.

This great head of equity is derived from the civil law, and is founded upon the immutable principles of justice and benevolence. It protects the rights of sureties as between themselves, compelling a just contribution from each; and as against their principal, by subrogating them, on the payment of the debt, to all his rights. And it will, under certain circumstances, interpose its powers, and prevent the principal from impairing or destroying the collateral indemnities which he holds from his debtor; or, if destroyed, will, to the same amount, relieve the sureties. And this does not embrace securities taken at the time the debt was created only; for where the principal in a bond having been sued, gave bail, against whom judgment was entered, the original sureties having paid the debt, obtained a decree for the assignment of this judgment. Parsons v. Briddock, 2 Vern. 608; Wright v. Mosly, 11 Ves. 22; 3 Bligh, 590, 591; 6 Ves. 805; 1 Story, Eq. Jur. 477; 1 Ves. 339; 2 Ves. 569, 570; 2 Johns. Ch. 560; 4 Johns. Ch. 323.

But the great question in this case is, whether, after judgment, the relationship of principal and surety exists. The affirmative of this question is earnestly and ingeniously maintained, by the complainants' counsel. They rely upon certain statutory provisions, and the decision of the supreme court of the state.

By the 8th section of the act to regulate judgments and executions, passed 24th February, 1824, it is provided, that in all cases where judgment is rendered upon any bond, sealed bill, promissory note, or other instrument of writing, in which two or more persons are jointly and severally held and bound, if it shall be made to appear to the court that one or more of said persons so bound, signed the same as surety or bail for his or their co-defendant, it shall be the duty of the clerk, in entering the judgment, to designate the principal and sureties, and the execution is required to issue first against the principal whose property shall be exhausted, before execution shall issue against the surety. And in the 9th section of the act to regulate proceedings where banks or bankers are parties, passed February 2, 1824, it is provided, that a bank may bring a joint action against all the drawers or indorsers and declare for money lent, &c. These statutes introduce a new principle in pleading, and in the rendition of judgment in certain cases; and they seem to have been, in the mind of the legislature, in some degree connected. They were passed at the same session. That which authorized a joint proceeding against all the drawers or indorsers, and which, by construction, authorizes a procedure against all drawers and indorsers be-

ing first enacted, seemed to require a protection to sureties which was given in the second statute. This statute provides a new remedy for sureties unknown to the law, but it does not establish any general principle, or change the relation of principal and surety as it before existed. The remedy affords summary relief to a surety against the hardship or inconvenience of a joint judgment, as authorized by the previous statute; but it does nothing more than this. And it might be a matter of doubt, if the relationship of principal and surety exist after judgment, whether equity could interpose in a case where this plain and adequate relief at law had been neglected. Unless this be made an exception to the general rule, equity could give no relief except upon special ground of fraud or circumstances, which prevented or rendered ineffectual the remedy at law.

The case of Dixon v. Ewing's Adm'rs, 3 Ohio, 280, is considered by the counsel as conclusive of the present question. That was a bill in chancery which stated that the complainants joined in a title bond to Ewing, as the securities of one Foot, for the conveyance of a tract of land. They had no interest in the transaction. Foot failed to convey the land. Suit was brought on the bond and a judgment obtained. Execution on the judgment was issued and levied on the personal property of Foot. The levy was afterwards discharged by the plaintiffs' attorney, without their knowledge, and the property was returned to Foot. And the court enjoined the plaintiffs at law to the amount of the value of the property levied on. In their opinion the court say: "Our statute for the relief of bail and sureties is a beneficial one, and although this case, as it now stands, is not within its letter, it is within its spirit, at least, so far, as injurious preferences are attempted." This decision rests upon general principles, and not upon the construction of a statute. If it involved the construction of a statute of the state, it would, under our practice, constitute a rule of decision for this court. But standing, as it does, upon principles of general law, it can only be considered as the authority of a high and enlightened court. In this view it will be regarded, and if it shall fail to establish the rule on this subject, it cannot fail to command the highest respect. The decision is in point and if it be conformable to law, it is conclusive of the question under consideration.

A case similar in principle, and not very dissimilar in facts, came before the supreme court of the United States, and is reported in [Lenox v. Prout] 3 Wheat. [16 U. S.] 520. In that case a judgment was obtained against the maker of the note, and a separate judgment against the indorser. The indorser fearing the failure of the maker of the note, called upon the agent of the plaintiff and requested an execution to be issued. It was issued, and the indorser offered to point out property to the marshal on which he might levy the amount of the judgment; and proposed to indemnify him for so doing. The execution was recalled by the plaintiff's agent, and the maker of the note became insolvent. In their opinion the court say: "Although the original undertaking of an indorser of a promissory note be contingent, and he cannot be charged without timely notice of nonpayment by the maker, yet, when the holder has taken this precaution, and has proceeded to judgment against both of them, he is at liberty to issue an execution or not, as he pleases, on the judgment against the maker, without affording any cause of complaint to the indorser; or, if he issues an execution, he is at liberty to make choice of the one which he thinks will be most beneficial to himself without consultation with the indorser." And they add: "If the indorser suffers any injury, by the negligence of the judgment creditor, it is clearly his own fault, it being his duty to pay the money, in which case, he may take under his own direction the judgment against the maker." The assignment of the judgment was provided for by the statute of Maryland. It is insisted that the language of the court, in this case, means nothing more than to "distinguish the position of the indorser after judgment, from that of conditional liability, which he occupies before it." But is this the full import of the decision? Do not the court say, after judgment, the plaintiff is not bound to take out execution against the principal, or if issued, to have it levied, though property be shown to the marshal, and an offer be made to indemnify him; and this in a case where the principal became insolvent, and all recourse against him was lost? If the relation of principal and surety existed after the judgment, and the surety had an equitable right to do what he did do, he had good ground for relief. But the court take this position from the surety. They tell him that his liability is in no respect affected by the conduct of the creditor, and that he is bound, absolutely bound to pay the judgment.

The same principle is decided by Chancellor Kent in the case of Bay v. Tallmadge, 5 Johns. Ch. 312. That was a case where there was a postponement of an execution against the principal, without the assent of the sureties, and to their injury. But the chancellor says "the postponement did not discharge the sureties from their obligation to pay the judgment against them." "Their privileges as bail," he says, "were lost and they had become fixed as principal debtors." And he further remarks: "I am not aware of any case that has ever imposed upon the creditor the necessity of peculiar diligence against the principal, on the ground of the still subsisting relation of principal and surety, after judgment and execution against the bail or surety. It becomes then too late to inquire into the antecedent relations between

the parties. Those relations become merged in the judgment."

My researches have not enabled me to find a single case, except the one cited from the Ohio reports, where relief has been given on the ground that the relation of surety subsists after judgment. There are many cases where a court of chancery has acted on this relationship and given relief before judgment. In some instances, under very peculiar circumstances, it has required the principal to use peculiar diligence. And in all cases where the surety has paid the debt of his principal, equity will substitute him to all the rights of the creditor. This doctrine is learnedly discussed by Chancellor Kent, in the case of Millard v. Cheeseborough, 1 Johns. Ch. 408; and by Mr. Justice Story, in his treatise on Equity (volume 1) under the head of "Substitution." 2 Johns. Ch. 562; 3 Mer. 579; 2 Fonbl. Bankr. Cas. 302, note 1; 17 Ves. 517, 520, are, also, full on the point. In the case of Hayes v. Ward, 4 Johns. Ch. 123, Chancellor Kent, under peculiar circumstances, enjoined a suit at law against a surety, until the creditor had pursued his remedy on a mortgage for the same debt. But these cases all proceed upon equities held to exist prior to the judgment, or upon the fact of payment of the judgment by the surety. And this doctrine, when examined, will be found consistent with the principles of justice.

A rule which would make the liability of a surety depend upon contingencies until all the resources of the principal were exhausted, and that by a strictly legal course, would seem to regard the protection of the surety more than the safety of the creditor. It would be inconvenient in practice, and not suited to a commercial community. The accommodation indorser agrees to pay on condition of demand and notice. And why should he be permitted to vary his contract, or excuse himself from its performance? By paying the money he is substituted to all the means of coercion against the principal which the creditor could use; and, also, to all the collateral indemnities he holds. And after judgment against him, this is the only relief, it would seem, which the law gives him. It is as ample a one as can be afforded, and imposes no hardship, of which the surety has a right to complain. In the present case Findlay's character, as surety, was merged in the judgments; and he could claim, as surety, no equities but the right of substitution on the payment of the judgments. If Findlay be regarded as a principal, and equally liable with Sutherland to pay the judgments, it is not perceived on what ground he can ask the interference of this court. The position assumed by the counsel is admitted, that where a creditor has a claim on two funds, and another creditor has a claim on one of the funds, equity will either restrain the creditor from going against the fund liable to both, or, on its exhaustion, will substitute the creditor of this fund to the rights of the other.

But how can this doctrine be made to apply in the present case? The defendants are all principals, and Sutherland, the owner of the property, is bound to pay all the judgments. And by a conveyance of his property he does pay one in full and others in part. Now, is there any principle of equity which will restrain him from doing this? I confess I know of none. The complainants insist that it was not the intention of the bank to make an application of the proceeds of the lands conveyed to it by Sutherland, different from that which the law would make. Mr. Jones, the agent of the bank, does state in his deposition, that he objected to the clause in the agreement, which provided that Hough's liabilities should be first discharged, and that it was agreed that this clause should be altered. But this statement is not corroborated by Mr. Wood, who drew the agreement, and no alteration of it was ever made. On the contrary, it appears that the bank permitted satisfaction to be entered of the judgment against Hough, which sanctioned this part of the contract. It would be extremely dangerous to admit parol evidence to vary, or alter, a written agreement. The rule is well settled, that such evidence cannot have this effect, especially where the written agreement has been acted on and confirmed, and there is no fraud.

The marshal, it appears, credited the amount of his sales on the respective executions and order of sale; and this, it is insisted, is obligatory on the bank, and must fix the rule by which the proceeds of the lands conveyed must be applied. The credits thus entered show, it is urged, the election of the bank, which, being made, cannot be changed. On the other side, it is contended, that the credits were entered by the marshal without the direction of the bank, which looked to the agreement for the application of the proceeds, and not to the marshal. It is very clear that the act of the marshal, in this respect, cannot bind the bank, especially where a different application of the proceeds had been made by the parties. The marshal's sale was provided for in the agreement, probably, with a view to perfect the title, and give to Sutherland the benefit of any advance of price for which the lands might sell. They sold for less than the contract price, and, of course, the sale could have no effect on the contract. We must look to the contract, and not to the marshal's sale and return, for the sum to be credited, and the mode of its application. The agreement does not change, except as to the judgment against Sutherland only, the legal application of the proceeds of the mortgaged premises. It provides that the judgment, including interest and costs, of $5,462 20, and the note, including interest, amounting to $4,779 88, shall be first satisfied and discharged out of said sum of $25,794, so far as derived from the

property mortgaged to secure said judgment and note; and the residue to be satisfied out of the proceeds derived from the other property, not interfering with the amount received from the property mortgaged for other purposes. The balance remaining due on the above judgment and note, after exhausting the mortgage given to secure their payment, is, by the agreement, to be paid out of the proceeds of the lands not mortgaged. And no ground is perceived which authorizes this court to change this application of the proceeds of this property. It disregards the priority of the judgment against Findlay, but of this, as has been stated, his representatives cannot complain. He stands as a principal in the judgments, and can be considered in no other light, until the judgments shall be satisfied. The judgment against Sutherland, only, was secured by mortgage, but the proceeds of this mortgage, under the agreement, were applied in the payment of Hough's liabilities. So that that judgment stands without any special provision for its payment.

. It is insisted, that this judgment shall be paid out of the proceeds of the property not covered by the mortgages, on the ground that the bank had a right to make such an application. The bank, undoubtedly, might have provided in the agreement for the payment of this judgment in the manner stated, but it has not done so; and the court, under the peculiar circumstances of this case, will not direct the credit to be thus entered. This judgment must stand with the judgment against Findlay, both of which were entered on the same day, and levied at the same time, to be discharged in proportion to their respective amounts, out of the proceeds of the property levied on. It is agreed in the contract that the premises described shall be taken by the bank, subject to the judgment of Busenbach. If the bank, in the language of the agreement, received the property subject to this judgment, no deduction should be made, from the consideration stated, on account of it. Indeed, it would seem that this judgment was deducted from the general amount, before the contract was drawn. The calculations can be made, and the credits entered, in conformity with this opinion. Decree. &c.